ELBERT BUDIN AND SHIRLEY BUDIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Budin v. Commissioner
Docket No. 20928-92
United States Tax Court
T.C. Memo 1994-185; 1994 Tax Ct. Memo LEXIS 192; 67 T.C.M. (CCH) 2788; April 28, 1994, Filed *192 Decision will be entered for respondent. During 1980 and 1982 through 1988, the years in issue, Ps engaged in a horse breeding, training, and jumping activity. Ps incurred losses in 1980, and 1982 through 1992, when Ps terminated the activity. Ps did not conduct their horse activity in a businesslike manner. Ps failed to keep complete and adequate records. Ps did not have a budget, but added capital to the activity as needed. With respect to the activity, for all years in issue, Ps generated $ 23,780 in income and $ 2,028,471 in expenses. Ps' primary motive for engaging in the activity was to promote their son's interest in horses. Held: Based on the facts and circumstances of the case, the horse activity was not engaged in for profit under sec. 183. Held, further, Ps are not entitled to a sec. 1231 loss in 1988 from the disposition of a horse used in the activity. For petitioners: Robert D. Tolz. For respondent: Raymond A. Kahn. LARO
LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: This case is before the Court pursuant to a petition filed by Elbert Budin and Shirley Budin (petitioners) for redetermination of respondent's determinations reflected in *193 two notices of deficiency issued to them on June 18, 1992. Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(1)(A)
6653(a)(2) [1]
6653(a)(1)(B)
1980
$   1,024
--
--
--
--
1982
60,315
[2] $ 2,920
--
[3]
--
1983
101,974
[2] 5,099
--
[3]
--
1984
140,984
[2] 7,049
--
[3]
--
1985
164,364
[2] 8,218
--
[3]
--
1986
161,623
--
8,081
--
[3]
1987
138,342
--
6,917
--
[3]
1988
73,414
3,671
--
--
--
Respondent also determined that the deficiencies for 1987 and 1988 were substantial underpayments attributable to tax-motivated transactions under section 6621(c), [1] and, accordingly, that petitioners are liable for interest, after December 31, 1986, at 120 percent of the interest rate established under section 6621(b). Respondent alleged in an amendment to her answer *194 that petitioners were not entitled to the section 1231 loss of $ 53,087 that they reported for their 1988 taxable year. According to respondent, disallowance of this loss increases petitioners' 1988 deficiency by $ 9,800, and increases their 1988 addition to tax under section 6653(a)(1) by $ 490. Following concessions by petitioners, [2] the issues for decision are: (1) Whether petitioners' horse activity during the taxable years in issue was an activity "not engaged in for profit" within the meaning of section 183. We hold it was. (2) Whether petitioners are entitled to a loss under section 1231 in the amount of $ 53,087 from the sale of a horse in 1988. We hold they are not. (3) Whether petitioners are liable for additions to tax for negligence for all years in issue. We hold they are. (4) Whether petitioners are liable *195 for interest on substantial underpayments attributable to tax-motivated transactions under section 6621(c) for their 1987 and 1988 taxable years. We hold they are. FINDINGS OF FACT Some of the facts have been stipulated and are so found. . The stipulations and exhibits attached thereto are incorporated herein by this reference. During the years in issue, petitioners were husband and wife; they filed Federal income tax returns using the status of "Married filing joint return". At the time the petition was filed, petitioners resided separately in New York State. During the years in issue, Mr. Budin was a director and filmmaker of television commercials. His employee income was substantial. [3] Mrs. Budin worked at various jobs before her marriage to Mr. Budin in 1955, none of which were horse-related. With the exception of the horse activity mentioned below, Mrs. Budin did not work outside the home after her marriage. *196 Prior to 1978, petitioners had no involvement or experience in horse breeding and never owned or operated a horse farm. In 1978, Mrs. Budin started a horse breeding, training, and jumping activity (the activity). Mr. Budin provided funds but was not otherwise involved in the activity. Mrs. Budin learned about horses by attending horse shows, consulting experts, reading literature, and speaking with reputable individuals in the field. Additionally, in the early years of the activity, Mrs. Budin was involved in the social aspects of the horse operation. Petitioners' son, Sky, began riding horses in 1975, at the age of 7. As a boy, Sky was "completely submersed" in horses and knew that he wanted to spend his life working with horses. From age 7 to age 20, Sky trained with experts who had outstanding reputations. These experts provided Sky and Mrs. Budin with advice on horse purchases and taught Sky the elements of horse training. Sky began to show potential as a horseman when he was 9 years old. Mrs. Budin retained top horse experts and came into contact with reputable horse sellers in order to nurture her son's career; petitioners considered Sky to have the potential to become *197 a world-class rider. When Sky was about 14 years old, he began to participate actively in the conduct of the activity. In 1985, Sky dropped out of high school to pursue the horse activity full-time. Petitioners' plan was to breed horses, particularly an American jumper, and sell the offspring for a profit. [4] Additionally, petitioners planned to buy young horses, train them, and sell them for a profit. Petitioners acquired 19 horses between 1978 and 1988. Of the 19 horses purchased, 10 were geldings (horses incapable of being bred); 8 of the 19 were European horses and none of these 8 were bred. Petitioners bred only one horse during all their years of operation. This horse was not an American jumper. Petitioners also hoped to make a profit from the stud fees of their stallions. However, petitioners did not stand their stallions for stud, and did not receive any income from stud fees. *198 Petitioners anticipated that it would take at least 5 to 6 years to develop the horses for resale. The cost of training, boarding, showing, and maintaining their horses was approximately $ 25,000 per annum per horse before petitioners engaged a reputable trainer in 1980. Following this engagement, petitioners' costs increased to approximately $ 50,000 per annum per horse. Petitioners did not advertise or otherwise market their horses. Petitioners never sold a horse for more than $ 50,000. Aside from minimal gains reported in 1988 from the sale of horses, petitioners' only reported income from the activity for all years in issue consisted of minimal amounts of horse show income. In each year, petitioners incurred substantial expenses consisting primarily of depreciation, breeding, and training expenses. In addition, in 1988, petitioners reported a loss of $ 53,087 under section 1231 from the sale of a horse. Thus, throughout the years in issue, petitioners reported substantial losses from the activity, and incurred losses until the activity was terminated in 1992. The following table sets forth, for the period in issue, the income, deductions, and net losses reported on petitioners' *199 Schedule F, "Farm Income and Expenses"; the gain or loss from horse sales reported on Form 4797, "Sales of Business Property"; petitioners' net loss from the horse activity; and petitioners' net income before accounting for the horse loss: Form 4797
Schedule F
Schedule F
Schedule F
Horse Sales
Year
Income [1]
Deductions
Gain/(Loss)
Gain/(Loss)
1980
$ 0 $ 48,728
($ 48,728)
$ 0 1981
N/A N/A
0 N/A 1982
0 116,779
(116,779)
0 1983
1,024 208,790
(207,766)
(3,178)
1984
(375)
281,593
(281,968)
0 1985
3,787 386,101
(382,314)
0 1986
3,600 326,648
(323,048)
0 1987
2,110 368,081
(365,971)
(10,668)
1988
13,634 291,751
(278,117)
[4] 17,557 Total
$ 23,780
$ 2,028,471
($ 2,004,691)
$  3,711
Net Horse  Income Before Year
Loss [2]  Horse Loss [3] 1980
($   48,728)
$   408,206
1981
N/A N/A
1982
(116,779)
349,935
1983
(210,944)
323,725
1984
(281,968)
574,663
1985
(382,314)
506,886
1986
(323,048)
638,262
1987
(376,639)
830,366
1988
(260,560)
878,877
Total
($ 2,000,980)
$ 4,510,920
*200 During the years in issue, several of petitioners' horses sustained injuries and were no longer saleable. Petitioners insured their horses against injuries and illnesses during the early years of the activity but stopped on the advice of an expert in the field. Petitioners did not use any financial data to guide them in managing the activity. Depending on the year, petitioners reported gain or loss from the sale of horses on either Schedule F, "Farm Income and Expenses", or Form 4797, "Supplemental Schedule of Gains and Losses". Aside from gain or loss reported from horse sales, petitioners failed to keep journals, ledgers, or other records for their activity. Petitioners did not prepare (or cause to be prepared) income statements, balance sheets, income projections, or other financial statements for the activity, other than those compiled annually by petitioners' accountant in preparation of petitioners' Federal annual tax returns. Petitioners did not have a budget; they contributed capital to the activity as needed. Petitioners kept invoices, receipts, canceled checks, and bank statements, but merely for the purpose of delivering required information to their accountant *201 for his preparation of their annual returns. Petitioners did not utilize these records to assist them in cutting expenses, increasing profits, or evaluating the overall performance of the activity. From 1978 through July 23, 1984, checks written with respect to expenses of the activity were drawn on either petitioners' personal checking account or the checking account of Mr. Budin's business, Ampersand Productions, Inc. On July 23, 1984, Mrs. Budin filed a Business Certificate with the County of Westchester, New York, reporting that she was conducting a business under the name of "Olympian Farm". Immediately after the filing of the Business Certificate, a separate checking account was opened for "Olympian Farm", and, thereafter, this checking account was used to pay all of the expenses of the activity. OPINION Respondent disallowed petitioners' deductions for petitioners' horse activity, having determined that it was not an activity entered into for profit. Section 183(a) generally limits the amount of expenses that may be deducted with respect to an activity "not engaged in for profit". The test for determining whether a taxpayer conducted an activity for profit is whether *202 he or she entered into, or continued, the activity "with the actual and honest objective of making a profit". Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be reasonable; however, he or she must have a good faith objective of making a profit. Allen v. Commissioner, 72 T.C. 28, 33 (1979); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. on another issue 615 F.2d 578 (2d Cir. 1980); sec. 1.183-2(a), Income Tax Regs; see also Westbrook v. Commissioner, T.C. Memo. 1993-634. Whether petitioners engaged in their horse operation with the requisite profit objective must be determined from the facts and circumstances of the case. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a) and (b), Income Tax Regs; see also Westbrook v. Commissioner, supra. *203 More weight is given to objective facts than to petitioners' statements of their intent. Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs; see also Holbrook v. Commissioner, T.C. Memo. 1993-383. Petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Golanty v. Commissioner, supra.
The following factors, which are nonexclusive, aid in determining if an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. Sec. 1.183-2(b), *204 Income Tax Regs; see also Westbrook v. Commissioner, supra. No single factor is dispositive, and a profit objective does not hinge on the number of factors satisfied. Golanty v. Commissioner, supra at 426; Dunn v. Commissioner, supra; sec. 1.183-2(b), Income Tax Regs. A review of the entire record in the context of these factors persuades us that petitioners did not engage in their horse activity with the requisite profit motive. With respect to the manner in which petitioners carried on the activity, one indicium of an activity engaged in for profit is a taxpayer's businesslike conduct toward an activity. Sec. 1.183-2(b)(1), Income Tax Regs. This includes the keeping of complete and accurate books and records. Id. Petitioners generally failed to keep journals, ledgers, or other records of income or expenditures with respect to their horse activity. Although they did keep invoices, receipts and canceled checks, the record indicates that this bookkeeping was minimal and was not done in a businesslike manner. The record also indicates that petitioners did not look to *205 these documents to assist them in cutting expenses, increasing profits, or evaluating the overall performance of their activity. We note that petitioners did not prepare a budget for the activity -- they merely put money into the activity as needed -- and did not maintain a separate checking account for the first 6 years of the activity. We also note that petitioners made no attempt to advertise or sell their horses. Given that their alleged business purpose was to breed and sell horses, we are hard pressed to conclude that they were operating the activity in a businesslike manner. Another indicium of an activity engaged in for profit is a change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability. Sec. 1.183-2(b)(1), Income Tax Regs. Petitioners argued that some of their horses could not be sold on account of injuries. Notwithstanding these injuries, however, these horses could still have been used for breeding purposes. Petitioners did not breed these "injured" horses. Petitioners have not alleged that they had difficulty breeding their horses, and failed to provide any evidence *206 that these injuries would have affected their plan to breed and sell the offspring at a profit. The record is also devoid of facts indicating that petitioners implemented a breeding plan or selected a method for purchasing horses appropriate for breeding purposes. Petitioners expected to breed an American jumper; to do so, however, they would need to breed European warm-bloods with American thoroughbreds. Petitioners did not acquire European horses until 1984, the seventh year of the activity, and petitioners never bred any of these European horses. In this regard, 10 of the 19 horses petitioners purchased were geldings and incapable of breeding. Preparation for an activity by extensive study of its practices or by consultation with experts may indicate that a taxpayer has a profit motive where the taxpayer follows such advice. Sec. 1.183-2(b)(2), Income Tax Regs. Petitioners made no showing that they undertook a study of accepted business and economic practices with respect to breeding and selling horses. Although petitioners retained reputable horse trainers, these experts merely provided training to Sky, and advised both Sky and Mrs. Budin on horse purchases for the purpose *207 of furthering Sky's horse career. In preparing for an activity, a taxpayer need not make a formal market study, but should undertake a basic investigation of the factors that would affect profit. Underwood v. Commissioner, T.C. Memo. 1989-625; Burger v. Commissioner, T.C. Memo. 1985-523, affd. 809 F.2d 355 (7th Cir. 1987). Petitioners failed to do so. We find no evidence to suggest that petitioners investigated the activity's potential for profit or evaluated the risks involved. Although petitioners consulted informally with successful horse trainers, petitioners seemed more intent on advancing Sky's career potential, and on building a reputation within the community, than in making a profit or in limiting their losses. Another factor to consider is the time and effort expended by petitioners in carrying on the activity. Sec. 1.183-2(b)(3), Income Tax Regs. The fact that the taxpayer devotes much of his or her personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive *208 a profit. Sec. 1.183-2(b)(3), Income Tax Regs. Mr. Budin spent substantially all his time involved in his director and filmmaking business and merely provided finances to the activity. Although Mrs. Budin spent all her time managing the activity, her involvement was more attributable to her son's interest in the activity than to any profit objective. Based on the record as a whole, petitioners have not demonstrated that the time and effort they devoted to the activity was indicative of a profit motive. Another factor to consider is petitioners' expectation that assets used in the activity may appreciate in value. Sec. 1.183-2(b)(4), Income Tax Regs. The record fails to indicate petitioners' good faith expectation that assets in the activity might appreciate in value. Based on the $ 50,000 per year cost of training, boarding, showing, and maintaining a horse, and in light of the 5 year period necessary to develop horses for resale, petitioners would have had to sell each horse for at least $ 250,000 more than they had purchased it for in order to break even. However, petitioners never sold a horse for over $ 50,000. With respect to petitioners' history of losses from the activity, *209 losses continuing beyond the period customarily necessary to make an operation profitable, if not explainable, may indicate that the activity is not engaged in for profit. [5]Sec. 1.183-2(b)(6), Income Tax Regs. All the same, a profit objective may exist despite a history of losses unaccompanied by any gains if the facts indicate that the business was conducted with the requisite profit objective. Bessenyey v. Commissioner, 45 T.C. 261, 273-274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Also, a series of losses at the beginning or start-up stage of an activity does not conclusively determine that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.
*210 Petitioners never reported a profit from the activity; the activity incurred losses throughout the 15 years of its existence. Petitioners used these losses to offset the significant amount of employee income that Mr. Budin earned from his filmmaking business. We find it fanciful that petitioners engaged in their horse activity for profit when, for all years in issue, petitioners generated only $ 23,780 of income and incurred $ 2,028,471 of expenses. Petitioners' history of losses clearly indicates a lack of a profit motive. With respect to elements of personal pleasure or recreation, the regulations state that "the presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved". Sec. 1.183-2(b)(9), Income Tax Regs. The mere fact that a taxpayer derives personal pleasure from engaging in an activity does not, in and of itself, mean that the activity is not engaged in for profit if other factors show otherwise. Id. Petitioners nurtured Sky in his goal of becoming a world-class rider. Mrs. Budin stated that her son's goal could only be achieved by *211 hiring and consulting with experts in the horse field. Petitioners took pleasure from the activity, both from watching their son develop into a horseman and from the reputation they hoped to acquire in the community as a result of their association with the horses, riders, and trainers. Based on all the facts and circumstances of the case, we hold that petitioners operated the activity without the requisite profit objective during the years in issue. [6] Accordingly, we sustain respondent's disallowance of deductions relating to the activity for each year in issue. With respect to the disallowance of the section 1231 loss, respondent has the burden of proof. Rule 142(a). Section 1231 permits deductions for losses sustained from the sale or exchange of property used in a trade or business. To be engaged in a trade or business, the taxpayer must engage *212 in an activity with continuity, and with the primary purpose of realizing income or profit from it. A sporadic activity, a hobby, or an amusement diversion will not qualify. Sec. 162; Groetzinger v. Commissioner, 480 U.S. 23, 35 (1987); Sec. 1.183-2(a), Income Tax Regs. Since petitioners' activity was not engaged in for profit, the horse was not property used in a trade or business. See Coe v. Commissioner, T.C. Memo. 1974-129. Accordingly, we sustain respondent's determination on this issue. Respondent determined additions to tax attributable to negligence for all the years in issue. For 1982 through 1985 and for 1988, section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence. For the 1982 through 1985 taxable years, section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. For 1986 and 1987, section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to *213 negligence, and section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. Negligence includes a lack of due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proving that respondent's determination of negligence is erroneous. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Respondent bears the burden of proof on the portion of the 1988 addition to tax alleged in her answer. Rule 142(a); Zalewski v. Commissioner, T.C. Memo. 1988-340. We find that the record contains no persuasive evidence rebutting respondent's determination on this issue. Based on the record, respondent has satisfied her burden of proof on the increased addition to tax in 1988 as well. In particular, we note that for all years in issue, petitioners reported an aggregate of only $ 23,780 of income from the activity, and deducted $ 2,028,471 in expenses connected with the *214 activity, thus, we sustain respondent's determination of additions to tax for negligence for all years in issue. Respondent also determined that petitioners are liable under section 6621(c) for increased interest on a portion of their tax deficiencies for the taxable years 1987 and 1988. Section 6621(c) provides that increased interest is due if a "substantial underpayment" is attributable to a "tax motivated transaction". A "substantial underpayment" is an underpayment of more than $ 1,000. Deductions disallowed under section 183 because a transaction was not engaged in for profit are attributable to a tax-motivated transaction. Sec. 301.6621-2T Q&A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984). We have determined that the activity was not entered into for profit. Accordingly, we hold that petitioners are liable for an increased rate of interest on the underpayment under section 6621(c). To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. Respondent erroneously made these determinations under section 6653(a)(2)(B)↩. 2. Respondent erroneously made these determinations under section 6653(a)(1)(A)↩. 3. This amount is 50 percent of the interest due on the deficiency. ↩
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners conceded a $ 4,215 adjustment unrelated to the horse activity.↩
3. Mr. Budin's employee income as reflected on Forms W-2, Wage and Tax Statement, was as follows: ↩
Year
Amount
1980
$ 403,774
1982
353,000
1983
405,649
1984
699,210
1985
686,698
1986
863,143
1987
903,031
1988
889,624
4. An American jumper is a horse bred in America from two breeding stocks, a European warm-blooded horse and an American thoroughbred.↩
1. Petitioners' Schedule F income is generally comprised of income earned from horse shows. In addition, the reported income reflects, for 1984, a $ 3,000 loss on sale of a horse, and for 1988, $ 11,500 gain on sale of a horse.↩
4. This amount includes petitioners' reported $ 53,087 loss under section 1231↩ from the sale of a horse. 2. "Net Horse Loss" is the sum of Schedule F Gain/(Loss) and Form 4797 Horse Sales Gain/(Loss).↩
3. "Income Before Horse Loss" for each year petitioners' Form 1040 grossed up by the amount of net horse loss for that year. ↩
5. We note that losses due to fortuitous circumstances, such as depressed market conditions or disease, are not an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.↩ Petitioners did not put forth any evidence that they had difficulty selling their horses because of bad market conditions.
6. Although petitioners may have commenced the activity with a profit motive in mind, this objective, if it existed at all, did not prevail in the years in issue.↩